# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

In re:                        )

                             )

     **JOHN THOMAS LONG,**       )      **Case No. 04-02736-TOM-7**

                             )

        **Debtor.**              )

---

     **JOHN THOMAS LONG,**       )

                             )

        **Plaintiff**            )      **A.P. No. 04-00111**

                             )

     **vs.**                     )

                             )

     **SALLIE MAE SERVICING, et al.,** )

                             )

        **Defendants.**       )

## MEMORANDUM OPINION AND ORDER

This adversary proceeding is before the Court following a trial on June 29, 2005, on the *Complaint to Determine Dischargeability* filed by the Plaintiff, John Thomas Long ("Mr. Long" or "Debtor"). Appearing at the trial were: David Murphree, attorney for Mr. Long; W. McCollum Halcomb, attorney for the Defendant, Education Credit Management Corporation ("ECMC"); Lisa Thigpen (via VTC), witness for ECMC; and Mr. Long. The Court has jurisdiction pursuant to 28 U.S.C. §§151, 157(a) and 1334(b) and the United States District Court for the Northern District of Alabama's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is

---

[1] 28 U.S.C. § 151 provides:

In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court.

a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).[2]  The Court has considered the pleadings,

the arguments of counsel, the testimony, the evidence admitted and the law and finds and concludes

as follows.[3]

## I.   FACTUAL BACKGROUND[4]

### A. Education and Loan Information

Mr. Long graduated from the University of Alabama in 1981.  In 1992, he began attending

Jones School of Law ("Jones") in the evenings while continuing to work a full-time job.  While

---

28 U.S.C. § 157(a) provides:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

28 U.S.C. § 1334(b) provides:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

The General Order of Reference as amended provides:

The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[2] 28 U.S.C. § 157(b)(2)(I) provides:
    (b)(2)Core proceedings include, but are not limited to–
        (I) determinations as to the dischargeability of particular debts;

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4] Mr. Long and ECMC submitted a *Joint Stipulation of Facts* ("*Joint Stipulation*")  prior to the trial.  Some of the facts in this section are taken from that joint stipulation.

2

attending Jones he applied for a series of student loans and received $21,650.00 as proceeds of these loans.  ECMC Exh. 5.

He graduated from Jones in 1995 and was admitted to the Alabama State Bar (the "State Bar") in April 1996.  After graduation he requested and received numerous forbearances and/or deferments to delay repayment of his student loans.  ECMC Exh. 7.  On May 21, 1997, Mr. Long consolidated these loans and he made four $220.66 payments, all within a 3 month span in 1998.  ECMC Exh. 6.  No additional full or partial payments have been made since then, and in fact the loan was in forbearance or deferred status for a substantial portion of the time period between 1998 and 2005.

ECMC purchased the consolidated loan on August 6, 2004, from USA Funds.  ECMC Exh. 2.  The consolidated loan was in default at the time it was purchased by ECMC.  The total amount owed on the consolidated loan held by ECMC as of June 24, 2005, was $55,778.28 with interest continuing to accrue at a rate of $10.16 per diem.  ECMC Amended Exh. 1.  ECMC is the type entity contemplated under 11 U.S.C. § 528(a)(8).  See *Joint Stipulation*  The consolidated loan is an education debt as contemplated under 11 U.S.C. § 523(a)(8).  Id.

Four repayment plans were available to Mr. Long through the United States Department of Education's William D. Ford Federal Direct Loan Program ("Direct Loan"): Standard, Extended, Graduated and Income Contingent.[5]  Participation in these repayment plans is voluntary.  Based on

---

[5]  Under the standard repayment plan, the borrower pays a fixed amount each month until his or her loans are paid in full.  34 C.F.R. § 685.208(b) (2005).  Minimum monthly payments of at least $50.00 are required, and the borrower has up to 10 years to repay the loan(s).  Id.

Under the extended repayment plan, the repayment period may be extended from 12 to 30 years depending on the total loan amount.  34 C.F.R. § 685.208(c) (2005).  Like the standard repayment plan, this plan also requires minimum monthly payments of at least $50.00.  Id.

3

a family size of two[6] and an annual income of $30,000.00, Mr. Long's monthly loan payment would range from $291.83 to $684.14 depending upon the repayment plan chosen. <u>ECMC's Amended Exh. 19-2</u>. Similarly, based on a family size of two and an annual income of $25,000.00, Mr. Long's monthly loan payment would range from $208.83 to $684.14 depending upon the repayment plan chosen. <u>ECMC's Amended Exh. 19-3</u>. Monthly loan payments based on other criteria (ie. different family size and income) can easily be calculated using Direct Loan's online repayment calculator. Mr. Long chose not to participate in any of the repayment plans offered by Direct Loan. Despite filing bankruptcy Mr. Long is still eligible to participate in one of these repayment plans.

### B. Personal and Family

Mr. Long began using cocaine in 1998 after the death of his second wife. He remarried in 1999 and continued using cocaine with his third wife. His use of cocaine and alcohol dramatically

---

Under the graduated repayment plan, monthly payments start out low and generally increase every two years. 34 C.F.R. § 685.208(d) (2005). The length of the repayment period depends upon the total loan amount. 34 C.F.R. § 685.208(d).

The Income Contingent Repayment Plan ("ICRP") is a program that the Department of Education created to resolve the problem of student loan payments that would force families and individuals into poverty. Payments under the ICRP are calculated based on the borrower's adjusted gross income, family size and the federal Poverty Guidelines promulgated by the U. S. Department of Health and Human Services. 34 C.F.R. § 685.208(f)(1) (2005); 34 C.F.R .§ 685.209 (2005). The borrower's payments may not exceed 20 % of his discretionary income, which is defined as the borrower's adjusted gross income minus the federal poverty level for the debtor's family size. 34 C.F.R. § 685.209 (2005). Thus, if the borrower's income is less than the poverty level, his student loan payment under the ICRP would be zero.

The repayment period under the ICRP is 25 years. 34 C.F.R. § 685.209(c)(4) (2005). At the end of that period, any remaining debt is cancelled, leaving the loan debtor with only a tax to be paid on the debt forgiveness income. <u>Id.</u>

[6] The Court considered only Mr. Long's minor son as a dependent when calculating monthly loan payments.

increased, and by November 2000 he was spending between $500.00 and $1,000.00 each week to support his drug habit. He traded his legal services and used nearly all of his income to pay for drugs and alcohol. During this time, he and his family moved frequently because he was unable to pay rent or utilities.

He was arrested for possession of crack cocaine in August 2000.[7] The State Bar was notified of his arrest and he placed himself on disability / inactive status with the State Bar. The State Bar required him to enter a 35-day drug rehabilitation program in November 2000. After being released from the program he joined an Alcoholics Anonymous support group and has been drug and alcohol free (with one minor relapse in 2001) since then. He regularly attends Alcoholics Anonymous meetings each week. He separated from his third wife and moved in for a while with his parents in Mountain Brook, Alabama after being released from treatment. He subsequently acquired his own place for himself and his two sons.

After a hearing before the State Bar in January 2002, his law license was returned to active status. He is now a mentor with the State Bar's Lawyer Assistance Program, a peer support network for lawyers suffering from drug or alcohol dependency.

Other than his on-going struggle with alcohol and drugs, Mr. Long is a healthy 48 year-old man. He has two sons (16 and 20) from his first marriage and both are fairly healthy, although they both recently suffered from staph infections. His youngest son was injured while playing football but the injury was not permanent. He has sole custody of his youngest son and receives no financial assistance from the boy's mother. His older son lives with him, is presently unemployed and does not contribute to the household finances. Mr. Long testified that he cannot afford health insurance

---

[7] Mr. Long also received a DUI during this time period.

5

for himself or either of his sons and has had to pay medical expenses out of pocket.[8]

## C. Employment

Upon graduation from the University of Alabama in 1981 Mr. Long moved to Houston, Texas and worked as an insurance adjuster for American General Fire and Casualty earning between $28,000.00 and $30,000.00 per year. He was laid off from American General in 1985 and took a position as a claims adjuster with Continental Insurance Company the following year. While at Continental his salary increased from $30,000.00 to $35,000.00 per year, he had use of a company vehicle and he participated in the company's health and retirement programs. He was laid off from Continental in 1995 and was unemployed for several months until taking a position with Goldome Credit Corporation in Birmingham.[9]

After being admitted to the State Bar he was employed as an attorney with the Birmingham law firm of Patton & Veigas, P.C. ("Patton") from April 1996 until August 1996. While at Patton he received an annual salary of $20,000.00 plus a percentage of settlements. Unhappy with this arrangement, he left Patton in August 1996 with a number of case files. Patton sued him over the removal of these files and a settlement was ultimately reached.[10] Patton was listed on Schedule F as having a $12,500.00 unsecured claim. After leaving Patton, Mr. Long practiced law in Birmingham as a sole practitioner, although he was associated with other local attorneys from time

---

[8] A number of the debts scheduled and discharged in this bankruptcy were medical related.

[9] It was unclear based on the testimony and evidence exactly when Mr. Long returned to Alabama. The Court assumes, however, it was prior to beginning law school at Jones.

[10] The details of the lawsuit and the terms of the settlement were not provided to the Court. Mr. Long paid Patton $20,000.00 in 1997 and continued paying Patton under the settlement agreement until 2004.

to time. He is unsure of his exact income during these years but testified his highest annual income during this period was between $30,000.00 and $35,000.00. While unable to practice law, Mr. Long worked briefly as a car salesman for Serra Automotive from March 2001 until January 2002.

Since his reinstatement to the State Bar in 2002, Mr. Long has focused his practice mainly on criminal defense, personal injury and domestic relations. Nearly one-half of his personal injury cases are on a contingency basis. In non-contingency cases his billable hourly rate is $150.00. In such cases he takes a retainer or accepts payments but generally collects only 60% to 70% of his fees. He testified that he cannot afford to advertise in the yellow pages and relies mostly on word of mouth for new business. He currently has 30 to 35 active cases, mostly automobile accidents, with estimated fees of $2,000.00 to $4,000.00 each. He does not carry, nor has he sought, malpractice insurance, thus making him ineligible for client referrals from the Birmingham Bar. He said he assumed such insurance would be prohibitively expensive and therefore has not inquired about it.

### D. Income and Expenses

Mr. Long's annual income varies depending upon which source you are relying. However, it is clear that his income has steadily increased since his reinstatement to the State Bar in 2002. He testified that his 2002 income was between $28,000.00 and $30,000.00.[11] According to his testimony his income increased the following year to $30,000.00 or $32,000.00.[12] Although his 2004 tax returns have not been filed, he estimates his income last year was between $34,000.00 and

---

[11] In 2002, his annual reported income for tax purposes was $18,874.00 ECMC Exh. 15-1. His Statement of Affairs also lists his 2002 income as $18,874.00. ECMC Exh. 12-1.

[12] In 2003, his annual reported income for tax purposes was $24,307.00. ECMC Exh. 16. His Statement of Financial Affairs estimated his 2003 annual income at $30,000.00. ECMC Exh. 12-1.

$35,000.00. He said his current financial situation is getting better and hopes to continue building his law practice.

Similarly, it is impossible to decipher Mr. Long's actual monthly expenses based on the evidence before the Court. In addition to Mr. Long's testimony, the Court reviewed Schedule J in his bankruptcy case and his responses to written interrogatories relating to his monthly expenses. ECMC Exh. 13 & 14.

According to Schedule J, Mr. Long's monthly expenses are $2,349.00.[13] However, based on his testimony and interrogatory responses his monthly expenses are more than $4,000.00.[14] ECMC Exh. 20. In many instances, Mr. Long provided three different expense amounts for the same service or expense category (ie. telephone, electricity, gas, recreation). The variation between these three amounts was often significant. Further, some expenses not listed at all on Schedule J were included in the interrogatory responses or in his testimony.

The following chart summarizes the expenses as listed on Schedule J:

---

[13] It should be noted that this amount does not include the monthly car payments and insurance on the vehicle Mr. Long purchased post-petition.

[14] It is impossible to calculate an exact amount of his monthly expenses based on his testimony and interrogatory responses. However, ECMC provided the Court with a comparison chart showing the difference in Schedule J expenses and expenses listed in his interrogatory responses. ECMC Exh. 20. Adding to the confusion was Mr. Long's testimony about his monthly expenses, much of which differed from both Schedule J and his interrogatory responses.

| Monthly Expenses | Schedule J Expenses |
|---|:---:|
| Rent | $750.00 |
| Power | $200.00 |
| Water & Sewer | $25.00 |
| Telephone | $80.00 |
| Food | $500.00 |
| Car Insurance | $84.00 |
| Clothing | $100.00 |
| Medical & dental expenses | $100.00 |
| Recreation | $10.00 |
| Transportation | $100.00 |
| Regular expenses for operation of business | $400.00 |
| **Total Monthly Expenses** | **2,349.00** |

The total expenses listed on Schedule J are significantly less than the total expenses testified to at trial and included in written responses to interrogatories. For example, Schedule J lists monthly recreation expenses at $10.00. During trial, however, Mr. Long testified to spending $200.00 per month on recreation (including greens fees and dining out) and $65.00 per month for a YMCA membership. Monthly transportation expenses from Schedule J were listed as $100.00, but according to Mr. Long's testimony he spends $100.00 per month on oil changes and $275.00 per month on gasoline. Medical expenses of $100.00 per month were listed on Schedule J. At trial, Mr. Long testified that he spends $200.00 per month on medical expenses even though no one in his household has a chronic medical condition. Monthly telephone service was listed in Schedule J at

Case 04-02736-TOM7    Doc 24    Filed 07/29/05    Entered 07/29/05 13:26:30    Desc Main
Document      Page 9 of 26

$80.00. At trial, Mr. Long said his monthly telephone bill was $30.00 and his cellular telephone bill was $94.00. Schedule J lists monthly clothing expenses as $100.00 but his interrogatory responses state he spend $300.00 per month on clothing.

A number of expenses Mr. Long testified about at trial or listed in written interrogatory responses were not listed on Schedule J, including monthly cable service of $45.00, monthly gas heat (winter only) of $300.00 to $400.00 and cellular telephone service of $94.00.

Finally, four days before filing this adversary proceeding seeking to discharge his student loan obligations (and three months after filing this case) Mr. Long purchased a used 2001 Honda Accord from Roebuck Honda in Gadsden for $23,300.00. ECMC Exh. 18. After making a cash down payment of $7,500.00, the total amount financed through Honda was $15,800.00 at an interest rate of 23.99%. Id. Monthly payments on the vehicle are $454.44. Id. His youngest son, who was 15 at the time, now drives his old vehicle, a 1995 Saturn. Because the Honda was purchased post-petition, car payments and insurance on the vehicle were not included on Mr. Long's Schedule J.

Mr. Long filed this Chapter 7 case on March 25, 2004 and subsequently filed this adversary proceeding on June 25, 2004 to determine the dischargeability of certain student loan obligations owed to ECMC.

## II.    CONCLUSIONS OF LAW

Congress' main purpose in enacting the Bankruptcy Code was to ensure the insolvent debtor a fresh start by discharging his prepetition debts. Grogan v. Garner, 498 U.S. 279, 286 (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234 (1934)). In furtherance of Congress' fresh start policy, the Eleventh Circuit has generally construed exceptions to discharge narrowly. Haas v. Internal Revenue Service (In re Haas), 48 F.3d 1153, 1158 (11th Cir. 1995); Equitable Bank v. Miller

10

(In re Miller), 39 F.3d 301, 304 (11th Cir. 1994). However, 11 U.S.C. § 523(a)(8) specifically provides that only in certain circumstances will education loans extended by or with the aid of a governmental unit or nonprofit institution solely on the basis of the student's future earnings potential be discharged in bankruptcy. Several reasons have been cited to explain why Congress excepted student loans from a discharge in bankruptcy. One source claims that it was in response to "the perceived need to rescue the student loan program from insolvency, and to also prevent abuse of the bankruptcy system by students who finance their higher education through the use of government backed loans, but then file bankruptcy petitions immediately upon graduation even though they may have or will soon obtain well-paying jobs, have few other debts, and have no real extenuating circumstances to justify discharging their educational debt." Green v. Sallie Mae (In re Green), 238 B.R. 727, 732-733 (Bankr. N.D. Ohio 1999) (citing the "Report of the Commission on the Bankruptcy Laws of the United States," H.R. Doc. No. 93-137, 93d Cong., 1st Sess., Pt. II 140, n.14). Another source claims that Congress enacted 11 U.S.C. § 523(a)(8) to ensure that these kinds of loans could not be discharged by recent graduates who would then pocket all future benefits derived from their education. Andrews Univ. v. Merchant (In re Merchant), 958 F.2d 738 (6th Cir. 1992) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 466-75 reprinted in 1978 U.S.C.C.A.N. 5787).

However, notwithstanding these policy concerns, Congress also realized that not all student debtors abused the bankruptcy system, and that some student debtors were truly in need of bankruptcy relief. Thus, Congress determined that an absolute bar to the dischargeability of student loan debts would be too harsh and also unnecessary to effectuate the foregoing policy goals. Consequently, unlike other types of debt, such as alimony and child support for which a debtor

11

cannot receive a bankruptcy discharge, Congress permitted student loan debts to be discharged if the debtor could demonstrate extenuating circumstances.

## A. Dischargeability

A student loan is not dischargeable "unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents."[15] 11 U.S.C. § 523(a)(8). The creditor bears the initial burden of both proving that a debt is owed and such debt is the type contemplated by § 523(a)(8). Roe v. The Law Unit, et al. (In re Roe), 226 B.R. 258, 268 (Bankr. N.D. Ala. 1998). Once proven, the burden shifts to the debtor to show that repayment of the debt would cause an undue hardship. Id. The appropriate standard of proof for § 523(a)(8) is a preponderance of the evidence. Grogan v. Garner, 498 U. S. 279, 290 (1991).

### 1. The Debt

Mr. Long acknowledged in the "Joint Stipulation of Facts" submitted to the Court that he owes the debt to ECMC, that ECMC is the type of entity contemplated by § 523(a)(8) and that the consolidated student loans are the type contemplated by § 523(a)(8). Therefore, the burden at trial was shifted to Mr. Long to prove that repayment of the debt would be an undue hardship on him and his dependents.

---

[15] Section 523(a)(8) provides :

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

12

## 2. Undue Hardship

The Eleventh Circuit Court of Appeals recently adopted the three part test for proving "undue hardship" that was first articulated by the Second Circuit in <u>Brunner v. New York State Higher Educ. Serv. Corp</u>, 831 F.2d 395 (2d Cir. 1987).  <u>Hemar Ins. Corp. of Am. v. Cox (In re Cox)</u>, 338 F.3d 1238 (11th Cir. 2003).  Quoting <u>Brunner</u>, the Eleventh Circuit stated that

> [to establish "undue hardship," the debtor must show] (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

<u>Cox</u>, 338 F.3d at 1241.  This Court previously used the three part test established in <u>Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson)</u>, 5 Bankr. Ct. Dec. 532, 536-545 (Bankr. E.D. Pa. 1979) when determining undue hardship for student loan dischargeability.  However, the Court now uses the <u>Brunner</u> test to conform with the Eleventh Circuit's holding in <u>Cox</u>.

## I.  First <u>Brunner</u> Factor

The first <u>Brunner</u> factor requires Mr. Long to prove that based on his current income and expenses he cannot maintain a "minimal" standard of living for himself and his minor son if he is forced to repay the student loans.[16]  Courts have taken differing views about what constitutes a "minimal" standard of living.  Few courts still use the United States Department of Health and Human Services Poverty Guidelines as a "bright line" determination of the minimal standard of

---

[16]    The Court considered only Mr. Long's minor son as a dependent when calculating the poverty level based on family size.

living for student loan dischargeability purposes.[17]  The Court does not believe that, in most cases, a debtor and his family living at or slightly above the federally defined poverty line is maintaining a "minimal" standard of living.  Therefore, this Court rejects the notion that a debtor must fall below the federal poverty line to discharge a student loan.

This Court believes that a more thoughtful, analytical approach should be taken.  A minimal standard of living lies somewhere between "poverty and mere difficulty."  McLaney v. Kentucky Higher Educ. Assistance Authority (In re McLaney), 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004). The court must examine the debtor's living situation to ensure that the debtor has no unnecessary and frivolous expenses; however, the debtor should not be forced to live in abject poverty with no comforts.  Judge Benjamin Cohen best described a minimal standard of living as "a measure of comfort, supported by a level of income, sufficient to pay the costs of specific items recognized by both subjective and objective criteria as basic necessities."  Ivory v. United States Dep't. of Educ. (In re Ivory), 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001).  Judge Cohen went on to list numerous basic necessities needed to maintain a minimal standard of living:

> 1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.
> 2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.
> 3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.
> 4. People need vehicles to go to work, to go to stores, and to go to doctors. They must

---

[17]  These guidelines define eligibility for certain government benefits and programs and are designed to assist the needy and economically disadvantaged.  According to the 2005 Health and Human Services Poverty Guideline, the poverty level for a family of two is $12,830.00 per year.  Federal Register, Vol. 70, No. 33, February 18, 2005, pp. 8373-8375, *available at* http://aspe.hhs.gov/poverty/05poverty.shtml (last visited July 14, 2005.)

14

have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

Id.  Brunner requires that this determination be based on the debtor's current income and expenses, thus the Court must look at the debtor's income and expenses at the time of trial.  See Cox, 338 F.3d at 1241.

_____In this case it is difficult to determine Mr. Long's actual monthly expenses, his monthly income, or to do a simple comparison of his monthly income versus his monthly expenses to determine if he can maintain a minimal standard of living.  However, based on the testimony and other evidence, Mr. Long appears to have made few, if any, financial sacrifices.  He plays golf four times per month, he dines out regularly (including every day for lunch), he maintains his YMCA membership and he recently purchased a car even though no evidence was provided that his old car needed to be replaced.

This Court is generally reluctant to pick apart a debtor's schedules and testimony trying to squeeze every last dime from him.  However, when a debtor seeks to discharge a substantial student loan debt while maintaining his prepetition spending habits, especially when no financial sacrifices are being implemented, the Court feels compelled to do so.

The Court finds that Mr. Long either overestimated some of his monthly expenses or he has no real knowledge of the actual amount and his "guesstimates" are inconsistent.  For instance, $100.00 per month for oil changes and $275.00 for gasoline on two vehicles seems high given that

there was no testimony suggesting excessive driving or vehicle usage.[18]  The Court also questions Mr. Long's recreation expenses.  Based on his testimony he spends $200.00 on recreation (four rounds of golf and dining out) per month (up from $10.00 per month on Schedule J), $65.00 per month for a YMCA membership and $46.00 per month for cable television.  The Court recognizes that "[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." Ivory, 269 B.R. at 899.  However, Mr. Long may not argue that repayment of his student loan obligations will cause an undue hardship while at the same time spending over $300.00 per month on such "diversions."

The Court is also concerned with the amount Mr. Long spends dining out.  He eats lunch out every day, costing him approximately $115.00 per month.  His interrogatory responses indicate he spends $200.00 per month dining out.[19]  Additionally, according to his testimony, a portion of his $200.00 "recreation" expense is also used for dining out.  Clearly, Mr. Long spends a large portion of his monthly income dining out.  In the Court's opinion, it is too high in light of his current circumstances and could be reduced.

Finally, three months after filing this case and only four days before filing this adversary proceeding, Mr. Long purchased a 2001 Honda Accord for $23,000.00 at an interest rate of 23.99% and monthly payment of $454.44.  No evidence was presented showing that his previous vehicle, a

---

[18]  Mr. Long testified that he changes the oil in his vehicles every 3,000 miles.  Assuming an oil change costs $25.00, the estimated $100.00 would pay for four oil changes per month.  At that rate, Mr. Long and his son would have to drive their two vehicles in excess of 12,000 miles per month to necessitate four oil changes.

[19]  It is unclear whether the $115.00 for lunches is included in this $200.00.

1995 Saturn, needed to be replaced. In fact, his youngest son is now driving that vehicle.[20] Mr. Long could certainly have found a less expensive vehicle with a more reasonable monthly car payment and/or a lower interest rate or at least delayed purchasing a new vehicle until he was more financially stable. That Mr. Long felt it was reasonable to incur such a large debt while seeking to discharge his student loans seriously concerns the Court. While this Court recognizes the difficulty in financing a car purchase after bankruptcy, with a $7,500.00 cash down payment the Court believes he could have purchased something with a lower monthly payment.

The Court also finds that even if Mr. Long reduced each of his expenses by a little bit, there would be sufficient income to provide a standard of living that is better than minimal. Based on the foregoing, the Court believes Mr. Long can maintain a "minimal" standard of living for himself and his dependent son if forced to repay his student loan at this time. A number of Mr. Long's expenses are more than necessary and could be reduced in order to begin repayment of the student loan obligation.

Therefore, Mr. Long has failed to prove the first prong of the <u>Brunner</u> test. Because the first element of <u>Brunner</u> was not proven the student loan obligation may not be discharged. However, the Court will discuss the remaining two <u>Brunner</u> factors as they relate to this case.

### ii. Second <u>Brunner</u> Factor

The second <u>Brunner</u> factor requires the debtor to show additional circumstances indicating that his or her state of affairs (that is, his inability to maintain a minimal standard of living if forced to repay the student loans) is "likely to persist for a significant portion of the repayment period."

---

[20] His son was more than six months from turning 16 years old when Mr. Long purchased the vehicle. In Alabama, one must be at least 16 years of age to receive a driver's license. Therefore, for at least six months Mr. Long had two vehicles for only one driver.

17

Brunner, 831 F.2d at 396. These circumstances must demonstrate a "certainty of hopelessness, not simply a present inability to fulfill financial commitment." Nys v. Educ. Credit Mgmt., Corp. (In re Nys), 308 B.R. 436, 443 (B.A.P. 9th Cir. 2004). See also Cox, 338 F.3d at 1242. While there is no definitive list of what are considered "additional circumstances," they may include:

> 1. Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement;
> 2. The debtor's obligations to care for dependents;
> 3. Lack of, or severely limited education;
> 4. Poor quality of education;
> 5. Lack of usable or marketable job skills;
> 6. Underemployment;
> 7. Maximized income potential in the chosen educational field, and no other more lucrative job skills;
> 8. Limited number of years remaining in work life to allow payment of the loan; Brunner,
> 9. Age or other factors that prevent retraining or relocation as a means for payment of the loan;
> 10. Lack of assets, whether or not exempt, which could be used to pay the loan;
> 11. Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income;
> 12. Lack of better financial options elsewhere.

In re Nys, 308 at 446-47 (internal citations omitted). Where the debtor is "apparently healthy, presumably intelligent and well-educated, and shows no evidence of extraordinary burdens which would impair further employment prospects" discharge of student loan obligations is inappropriate." Shankwiler v. Natl. Student Loan Marketing, et al. (In re Shankwiler), 288 B.R. 701, 706 (Bankr. C.D. Cal. 1997).

The Court must begin by noting its previous conclusion that Mr. Long does not have a present inability to fulfill his financial commitments, specifically his student loan obligation to ECMC and will be able to maintain a far more than minimal standard of living if forced to repay that obligation. His current financial condition is not dire and certainly permits him to begin repaying

18

his loan, especially in light of the various Direct Loan repayment plans available to him. However, the Court believes it is necessary to discuss the second <u>Brunner</u> factor in this case.

Mr. Long failed to establish any additional factors which suggest his financial condition is likely to continue for a significant portion of the repayment period. In fact, his financial situation has been improving and will likely continue to do so. He is a healthy, extremely well educated man[21] with a number of productive work years ahead of him. Other than his continuing battle with addiction he suffers from no other major medical conditions that are likely to affect his ability to hold a steady job, nor do either of his children suffer from major medical problems that require specialized care. He testified that his sons had recently been treated for staph infection and his youngest son was injured playing football and required medical treatment. Neither of these are ongoing medical conditions, though.

Mr. Long argues his addiction to drugs and alcohol should be considered by the Court as an "additional circumstance." However, a debtor's drug and/or alcohol addiction was not an "additional circumstance" contemplated by Congress when the Bankruptcy Code was drafted. <u>See, e.g.,</u> <u>Roach v. United Student Aid Fund (In re Roach)</u>, 288 B.R. 437, 446 (Bankr. E.D. La. 2003). While Mr. Long's former addiction is unfortunate, the possibility of relapse does not necessarily prevent him from obtaining employment or advancement. In fact, Mr. Long has successfully resumed the practice of law. This Court is confident that Mr. Long's participation in the State Bar's Lawyer's Assistance Program and Alcoholics Anonymous will assist in his continued sobriety.

Other factors suggest that Mr. Long's financial situation will continue to improve. Mr. Long

---

[21] Mr. Long held down a full-time job while attending law school and passed the Alabama State Bar examination which suggests that he is bright and capable of increasing and improving his law practice.

Case 04-02736-TOM7    Doc 24    Filed 07/29/05    Entered 07/29/05 13:26:30    Desc Main
Document    Page 19 of 26

stated his financial situation had improved since his law license was reinstated but that rebuilding his law practice is a "slow process." His income has increased incrementally each year since he resumed practicing law in 2002. He estimates that he may earn $36,000 this year, an increase of nearly 25% from 2002. Additionally, Mr. Long's only minor child is now sixteen years old and in eighteen months will no longer be a dependent, further reducing his monthly expenses.

Mr. Long is not limited to a law practice, and his options are certainly enhanced by his education and work experience. He holds both a Bachelor's degree and a Juris Doctorate and prior to attending law school he had a successful career in the insurance industry earning the same, if not more, than he currently earns in addition to having medical and retirement benefits. This Court does not believe that he is "entitled to an undue-hardship discharge by virtue of selecting an education that failed to return economic rewards." Coveney v. Costep Servicing Agent, et al. (In re Coveney), 192 B.R. 140, 143 (Bankr. W.D. Tex. 1996)(citing Matter of Roberson, 999 F.2d 1132, 1137 (7th Cir. 1993)).

Given a little more time and his expanding practice it is entirely possible that Mr. Long's practice will grow and flourish. Because Mr. Long has demonstrated no "additional, exceptional circumstances" that suggest his current financial situation will continue for a substantial portion of the repayment period he has failed to prove the second prong of the Brunner test. Because the second element of Brunner was not proven the student loan may not be discharged. However, in order to complete the nondischargeability analysis, the Court will examine the third Brunner prong.

### iii. Third Brunner Factor

The third Brunner factor requires a showing that the debtor made a good faith effort to repay the student loans. Brunner, 831 F.2d at 396. What is considered a debtor's good faith effort varies

widely among courts; however, courts are generally reluctant to find good faith where a debtor made minimal or no payments on his or her student loans. See, e.g., Murphy v. CEO/Manager, Sallie Mae, et al. (In re Murphy), 305 B.R. 780 (Bankr. E.D. Va. 2004)(no good faith where the debtor made no payments on her student loans); Garrett v. New Hampshire Higher Educ. Assistance Found., et al. (In re Garrett), 180 B.R. 358, 364 (Bankr. D.N.H. 1995)(no good faith shown where "[t]he record is devoid of any payment made by [the debtor] on these loans or even any attempt to enter into a repayment schedule with [the lenders]"). Other factors to consider include the amount of the student loan debt as a percentage of the debtor's total indebtedness and whether the debtor attempted to find employment. See, e.g., Murphy, 305 B.R. at 798 (citing Hall v. U.S. Dep't. of Educ. (In re Hall), 293 B.R. 731, 737 (Bankr. N.D. Ohio 2002)(citations omitted).

Some courts also consider whether the debtor attempted to negotiate a repayment plan, or explored various repayment options such as the standard repayment plan, extended repayment plan, graduated repayment plan and income contingent repayment plan. See, e.g., Educ. Credit Mgmt. Corp. v. Mason (In re Mason), 315 B.R. 554, 563 (B.A.P. 9th Cir. 2004): Cota v. U. S. Dept. of Educ. (In re Cota), 298 B.R. 408, 420 (Bankr. D. Ariz. 2003). A debtor's failure to take advantage of those repayment options is not per se indicative of bad faith, however. Cota, 298 B.R. at 420. The U.S. Department of Education's repayment plans may not be used as a sword to prevent dischargeability of student loans if the debtor chooses not to participate in them.

Since graduating from Jones Mr. Long has made four $220.66 payments towards his student loans, all within a three month period in 1998. He sought and was granted a number of forbearances and/or deferments between 1997 and 2003. Other than the four payments made in 1998, no additional full or partial payments have been made. While this alone may not indicate a lack of good

21

faith, given the totality of the circumstances the Court believes that Mr. Long has not demonstrated a good faith effort to repay his student loan obligations.

From August 1998 until November 1999, Mr. Long spent between $500.00 and $1,000.00 per week on drugs.[22] That money, or at least a portion of it, could have been used to begin repaying his student loan obligation to ECMC. While the Court sympathizes with Mr. Long's addiction and applauds his diligence in requesting numerous forbearances and deferments, his failure to repay the debt during those times when it appears he had the financial ability to do so cannot be overlooked simply because of his addiction. This Court is compelled to determine that a debtor who forbears a debt and uses money which otherwise could have gone to repay that debt to buy illegal drugs and alcohol demonstrates a lack of good faith to repay the debt.

More recently, Mr. Long made a $7,500.00 cash down payment on a 2001 Honda Accord. Despite having this much excess cash on hand, he chose not to send any of it to ECMC. Even sending a portion of that money to ECMC would have shown the Court Mr. Long was at least attempting to repay his student loan obligation, thus demonstrating a minimal level of good faith.

Further, Mr. Long knew or should have known of the various repayment programs offered by the Department of Education but chose not to explore them. That Mr. Long chose not to take advantage of one of these programs is not alone sufficient to demonstrate his lack of good faith. However, had he at least explored and considered the programs, even if he ultimately chose not to utilize them, the Court would find it easier to accept that his failure to pay was in good faith.

Finally, Mr. Long scheduled an unsecured student loan debt of $30,583.06 owed to ECMC.

---

[22] The Court acknowledges the testimony about Mr. Long's struggles and tragedies in his personal life. However, while the Court is sympathetic, this does not change the Court's ultimate conclusion.

Case 04-02736-TOM7    Doc 24    Filed 07/29/05    Entered 07/29/05 13:26:30    Desc Main
Document    Page 22 of 26

However, according to the "Stipulation of Facts" the total amount due on the student loan debt is $55,778.28.  This student loan debt accounts for nearly 40% of the total debt he seeks to have discharged in his Chapter 7 bankruptcy.

Based on the foregoing, the Court finds that Mr. Long has not made a good faith effort to repay his student loan obligations and therefore has failed to prove the third prong of the Brunner test.  Because the third Brunner element was not proven the student loan may not be discharged.

### III.  CONCLUSION

Discharge of student loan obligations should be limited to only exceptional cases.  This is not such a case.  Mr. Long failed to prove that he and/or his son will suffer undue hardship if he is forced to repay his student loan obligation to ECMC.  Although he deserves credit for successfully overcoming both his addiction and tragedy in his personal life, the Court does not believe the facts of this case warrant a discharge of his student loan debt.  Therefore, the Court finds that Mr. Long's consolidated student loan held by ECMC is not dischargeable under 11 U.S.C. § 523(a)(8). Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Debtor, John Long, to declare his student loan debt dischargeable pursuant to 11 U.S.C. § 523(a)(8) is **DENIED.** Accordingly, the balance of Mr. Long's consolidated student loan debt owed to the Defendant, Educational Credit Management Corporation, is hereby declared to be **NONDISCHARGEABLE**.

Dated this the 29th day of July, 2005.

_____       **/s/ Tamara O. Mitchell**
                                       TAMARA O. MITCHELL
                                       United States Bankruptcy Judge

TOM:jdg

23

xc:    David Murphree, Attorney for the Plaintiff, John Long
        W. McCollum Halcomb, Attorney for the Defendant, ECMC

Case 04-02736-TOM7   Doc 24   Filed 07/29/05   Entered 07/29/05 13:26:30   Desc Main
Document      Page 24 of 26

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

In re:                                    )
                                          )
    **JOHN THOMAS LONG,**                  )      **Case No. 04-02736-TOM-7**
                                          )
    Debtor.                              )

---

    **JOHN THOMAS LONG,**                  )
                                          )
      Plaintiff                       )      **A.P. No. 04-00111**
                                          )
    vs.                                  )
                                          )
    **SALLIE MAE SERVICING, et al.,**     )
                                          )
      Defendants.                     )

## JUDGMENT

In conformity with the Memorandum Opinion entered contemporaneously herewith, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Debtor, John Long, to declare his student loan debt dischargeable pursuant to 11 U.S.C. § 523(a)(8) is **DENIED.** Accordingly, the balance of Mr. Long's student loan debt owed to Defendant, Educational Credit Management Corporation, is hereby declared to be **NONDISCHARGEABLE** and a judgment to that effect is hereby entered.

Dated this the 29th day of July, 2005.

_____               **/s/ Tamara O. Mitchell**
                                          TAMARA O. MITCHELL
                                          United States Bankruptcy Judge

TOM:jdg

xc:   David Murphree, Attorney for the Plaintiff, John Long
      W. McCollum Halcomb, Attorney for the Defendant, ECMC

25

26